David R. Simon (SBN 145197)
**SIMON LAW GROUP**
17595 Harvard Avenue, Suite C515
Irvine, CA 92614
Ph. (714) 975-1728

Bryan W. Pease (SBN 239139)
**LAW OFFICE OF BRYAN W. PEASE**
3170 Fourth Ave., Suite 250
San Diego, CA 92103
Ph. (619) 723-0369

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| UNITED POULTRY CONCERNS, a Maryland nonprofit corporation,<br><br>**Plaintiff,**<br>vs.<br><br>CHABAD OF IRVINE, a California corporation; ALTER TENENBAUM, an individual; and DOES 1 through 50,<br><br>**Defendants.** | **CASE NO. 8:16-cv-01810-AB (GJSx)**<br>*Hon. André Birotte Jr., Ctrm 7B*<br>*Mag. Gail J. Standish, Ctrm 23*<br><br>**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT**<br><br>Date: January 23, 2017<br>Time: 10:00 a.m.<br>Location: Courtroom 7B<br>350 West First Street, Los Angeles |

# **Table of Contents**

I.    INTRODUCTION ...................................................................................................1

II.   Facts and Procedural History................................................................................2

III.   Argument ............................................................................................................2

  A.   This Court has diversity jurisdiction ...............................................................2

  B.   Abstention is not warranted ............................................................................8

  C.   Plaintiff has standing .....................................................................................12

    1.    The challenged act is a business practice ..................................................12

    2.    Defendants are violating Penal Code section 597(a) ................................13

  D.   There is no constitutional right to kill animals for religious purposes....................14

  E.   Defendants' actions are not speech ...............................................................17

IV.    CONCLUSION ..................................................................................................19

## <u>Table of Authorities</u>

**Cases**

*Animal Legal Def. Fund v. LT Napa Partners LLC* (2015) 234 Cal.App.4th 1270 ............ 1

*Animal Legal Defense Fund v. Great Bull Run* (June 6, 2014),
  Case No. 14-cv001171-MEJ, 2014 WL 2568685, 2014 U.S. Dist. LEXIS 78367 ......... 12

*Animal Legal Defense Fund v. LT Napa Partners* (June 10, 2015, No. S225790)
  ___Cal.5th___ [2015 Cal. LEXIS 4200].......................................................................... 12

*Animal Prot. & Rescue League, Inc. v. Northridge Owner, L.P.*
  (N.D.Cal. Aug. 24, 2016, No. 16-cv-01494-BLF) 2016 U.S.Dist.LEXIS 114232 ........... 2

*Animal Protection & Rescue League v. City of San Diego* (2015)
  237 Cal.App.4th 99 ............................................................................................... 5, 6

*Brady v. Mercedes-Benz USA, Inc.*, 243 F. Supp. 2d 1004 (N.D. Cal. 2002) .................... 7

*Castillo v. Pacheco* (2007) 150 Cal.App.4th 242 ........................................................ 18

*Colo. River Water Conservation Dist. v. United States* (1976) 424 U.S. 800.................... 9

*Executive Committee Representing Signing Petitioners of Archdiocese of Western*
  *U.S. v.Kaplan,* 2004 WL 6084228, at *6 (C.D.Cal. 2004) ........................................... 13

*Fraternal Order of Police v. City of Newark*, 170 F.3d 359 (3d Cir. 1999)..................... 14

*Galt G/S v. JSS Scandinavia*, 142 F.3d 1150, 1156 (9th Cir. 1998)................................. 3

*Hernandez v. Comm'r* (1989) 490 U.S. 680 ....................................................... 16, 17

*In re Ford Motor Co./Citybank (South Dakota), N.A.*, 264 F.3d 952 (9th Cir. 2001) ........ 2

*Kaahumanu v. Hawaii* 682 F.3d 789 (9th Cir. 2012) ...................................................... 18

*Lyons v. Chinese Hosp. Ass'n* (2006) 136 Cal.App.4th 1331 ........................................... 3

*Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar*, 179 F.3d 1244
  (9th Cir. 1999)........................................................................................................ 13

*People v. Orange County Charitable Services* (1999) 73 Cal.App.4th 1054................... 13

*Pines v. Tomson* (1984) 160 Cal.App.3d 370 ............................................................... 13

*Pulera v. F&B, Inc.*, 2008 U.S. Dist. LEXIS 72659 (E.D. Cal. Aug. 18, 2008)................ 7

*R.R. St. & Co. v. Transp. Ins. Co.*, 656 F.3d 966 (9th Cir. 2011)............................9, 10, 11

*Ridder Bros. Inc., v. Blethen*, 142 F.2d 395 (9th Cir. 1944)........................................2

*Roybal v. Governing Bd. of Salinas City Elementary Sch. Dist.* (2008)
  159 Cal.App.4th 1143 .........................................................................................4

*Southern Oregon Barter Fair v. Jackson County, Oregon,* 372 F.3d 1128
  (9th Cir. 2004)........................................................................................................17

*Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917....................5

**Statutes**

Cal. Bus. & Prof. Code section 17200 ...............................................................13

Cal. Food & Agriculture Code section 18945 ...................................................13

California Penal Code section 597(a) .......................................................1, 4, 13

Cal. Code of Civil Procedure section 1021.5.......................................................3

Cal. Penal Code section 7 ..................................................................................13

Cal. Penal Code section 599c..........................................................................1, 4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Opposition to Motion to Dismiss

## I.      INTRODUCTION

This is a diversity case, and Plaintiff therefore has the same standing to bring its California Unfair Competition Law ("UCL") claim in federal court that it would have in state court. This Court is bound to follow the highest California state court decision regarding UCL standing. As the declarations of Karen Davis and Ronnie Steinau filed with Plaintiff's motion for preliminary injunction ("MPI") being heard concurrently make clear, the fact pattern in the present case is virtually identical to *Animal Legal Def. Fund v. LT Napa Partners LLC* (2015) 234 Cal.App.4th 1270 ("*Napa Partners*"), and Plaintiff thus has standing.

There is no dispute that California Penal Code section 597(a) prohibits intentionally and maliciously killing animals. There is also no dispute the legislature provided certain specified exceptions in Penal Code section 599c, and killing solely for purposes of a religious ritual is not one of them. While there is nothing in the statute prohibiting a religious ritual around the killing of an animal also being used for another specified purpose, such as food, there is no exception that would allow Defendants to kill chickens that will simply be discarded for *any* reason, religious or otherwise.

In contrast, the currently pending state court case *Animal Protection and Rescue League v. Chabad of Irvine*, Orange County Superior Court case number 30-2015-00809469-CU-BT ("*Animal Protection*"), brought by a different plaintiff than that in the present case, does not address this issue of whether the killing itself is illegal under Penal Code section 597(a) when not using the birds for food. Rather, *Animal Protection* deals with Penal Code section 597*(b)* issues of animal cruelty and neglect, as well as violations of environmental, health code and sanitation laws.

The narrow question before this Court, which has not been raised in *Animal Protection,* is whether an exception – which the legislature has not seen fit to create – should be *judicially* created for Penal Code section 597(a) to allow killing and discarding chickens for religious rituals.

## II.     Facts and Procedural History

Plaintiff incorporates by reference the facts and procedural history from its motion for preliminary injunction being heard concurrently.

## III.     Argument

### A.     This Court has diversity jurisdiction

Defendants are citizens of California, while Plaintiff is an organization headquartered in Virginia and incorporated in Maryland. (Davis MPI Decl., Dkt. # 68-7, ¶ 2.) Thus, if the jurisdictional threshold is met, this Court has diversity jurisdiction.

"The Ninth Circuit has adopted the 'either viewpoint' rule for determining whether the request for injunctive relief carries the case over the jurisdictional amount threshold. *In re Ford Motor Co./Citybank (South Dakota), N.A.*, 264 F.3d 952, 958 (9th Cir. 2001)." (*Animal Prot. & Rescue League, Inc. v. Northridge Owner, L.P.* (N.D.Cal. Aug. 24, 2016, No. 16-cv-01494-BLF) 2016 U.S.Dist.LEXIS 114232, at *5 (*"Northridge"*.) Thus, "the potential cost to the defendant of complying with the injunction…represents the amount in controversy for jurisdictional purposes." (*Ibid.,* quoting *Ridder Bros. Inc., v. Blethen*, 142 F.2d 395, 399 (9th Cir. 1944).)

In the present case, Plaintiff has produced evidence that Defendants likely generate approximately $7,500 per year in revenue in using chickens for Kapparot and has offered to post a $7,500 bond to secure a preliminary injunction. Accordingly, over the course of about ten years, "the potential cost of complying with the injunction" would exceed the jurisdictional threshold. (*Northridge, supra,* 2016 U.S.Dist.LEXIS 114232, at *5.)

Defendants have produced no competent evidence to refute this claim. Instead, they have produced a spreadsheet from 2014 showing $1,701 in unidentified deposits, and expenses of $1,475 made out to "cash" and $250 made out to Ely Tenenbaum, a relative of Defendant Alter Tenenbaum. Defendants do not state how much they pay for each chicken nor refute Plaintiff's evidence that they charge $27 per chicken, and that

2

hundreds of people (who purchased hundreds of chickens) participated in Defendants' parking lot in 2014.

Defendants have also curiously made no statements regarding revenue in 2015 despite claiming to have performed the ritual that year as well, nor any for 2016 despite witnesses seeing them accepting money in exchange for performing the ritual at a licensed slaughterhouse while this Court's TRO was in effect. (Calvillo MPI Decl., Dtk. #68-5, ¶3; Mulato MPI Decl, Dkt. #68-12, ¶2.)

In addition to the cost to Defendants of complying with the injunction, "where an underlying statute authorizes an award of attorney's fees, either with mandatory or discretionary language, such fees may be included in the amount in controversy." (*Id.* at *6, quoting *Galt G/S v. JSS Scandinavia*, 142 F.3d 1150, 1156 (9th Cir. 1998).)

Code of Civil Procedure § 1021.5 provides in relevant part:

Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any.

If a plaintiff satisfies the elements of § 1021.5, a fee award is required. "'Although [section] 1021.5 is phrased in permissive terms (the court "may" award), the discretion to deny fees to a party that meets its terms is quite limited. The [S]upreme [C]ourt in *Serrano v. Unruh* [citation omitted], noted that the private attorney general theory, from which [section] 1021.5 derives, requires a full fee award "unless special circumstances would render such an award unjust."' [citations omitted]" (*Lyons v. Chinese Hosp. Ass'n* (2006) 136 Cal.App.4th 1331, 1344.)

In the present case, it is clear that if Plaintiff succeeds, it will satisfy the four-part test for an award of attorneys' fees under § 1021.5. First, the significant benefit Plaintiff

will confer on the general public in the present case is enforcement of an important animal cruelty law, Penal Code section 597(a), which prohibits the spectacle in which Defendants engage whereby they keep hundreds of chickens in tiny, filthy cages and boxes in their parking lot, and participants line up and pay a fee to have Defendants wave a chicken over their heads, then kill and discard the chicken. Such behavior tears at the social fabric by forcing the general public to bear witness to largescale animal cruelty that is actually illegal but being carried out in the name of religion. There are also public health and environmental risks posed by this behavior as described in the declaration of Michael McCabe. (Dkt. # 68-11.) The declaration of Ed Boks, former general manager of Los Angeles Department of Animals Services, also shows that Plaintiff's lawsuit could lead to the beneficial result of city managers enforcing animal cruelty laws uniformly rather than erroneously believing there is a constitutional right to kill animals for religious purposes. (Dkt. # 68-4.)

Second, while health code officials have previously stepped in to prevent Defendants from illegally sending unrefrigerated carcasses from an unpermitted, makeshift slaughterhouse to a food bank, there is no indication any public entity will seek to stop Defendants from killing and simply discarding the chickens. (Steinau Decl. ¶¶ 7-8.) Yet, the act of discarding the animals makes the killing itself illegal because the birds are *not* being used for food. (Penal Code sections 597(a), 599c.) Accordingly, it was "necessary" within the statute's meaning for Plaintiff to pursue this lawsuit privately to require Defendants to comply with these laws.

Third, the financial burden element is met where "the cost of the claimant's legal victory transcends his personal interest – that is, when the burden of the litigation was disproportionate to the plaintiff's individual stake in the matter." (*Roybal v. Governing Bd. of Salinas City Elementary Sch. Dist.*, (2008) 159 Cal.App.4th 1143, 1151.) Stated another way, the element is met if the need for pursuing the lawsuit placed a burden on the plaintiff out of proportion to its stake in the matter. (*Woodland Hills Residents Assn.,*

*Inc. v. City Council* (1979) 23 Cal.3d 917, 941.) Plaintiff seeks no damages; hence its expenditure was disproportionate to its stake in the matter. Thus, the necessity and financial burden of private enforcement make a fee recovery appropriate, and this element is satisfied.

Finally, because Plaintiff seeks no damages, it will be entitled to no "recovery," hence the element requiring that "fees should not … be paid out of the recovery, if any" is satisfied.

In *Animal Protection & Rescue League v. City of San Diego* (2015) 237 Cal.App.4th 99, 104 ("*City of San Diego*"), the California Court of Appeal upheld a CCP section 1021.5 fee award for undersigned counsel that included "fees for work performed during and prior to the filing of the litigation in this case, as well as for work performed in services rendered in a related case." While the related case had previously been dismissed, the court nonetheless awarded a portion of those fees because the tasks "were inextricably intertwined with the present action." (*Ibid.*)

At the time of filing the complaint in the present case, the billable hours expended by Plaintiff's attorneys, which Defendants will ultimately be liable for under CCP section 1021.5 if Plaintiff prevails, already exceeded $75,000. (Verified Complaint, ¶ 8.) Plaintiff filed an ex parte request for a TRO along with nine expert witness declarations with the complaint, which required a substantial amount of time to prepare. Additionally, attorneys for Plaintiff incurred substantial pre-litigation billable hours, including briefing some of the same issues in *United Poultry Concerns v. Bait Aaron*, Los Angeles Superior Court case number BC592712 ("*Bait Aaron*"). Attorney Aryeh Kaufman, who represents proposed amicus in the present case, represented some of the defendants in *Bait Aaron*, and there is substantial overlap between the issues presented by the two cases.

Plaintiff's attorney David Simon expended 426.65 billable hours in *Bait Aaron* at a rate of $500 per hour, totaling $213,325. (Simon Decl, Ex. A.) Attorney Simon estimates that no fewer than one third of the hours "spent in *Bait Aaron* were inextricably

intertwined with tasks necessary for the present case. Accordingly, no fewer than $71,000 of these hours are billable to the present case as reasonable pre-litigation hours." (Simon Decl., ¶ 4.)

United Poultry Concerns ultimately decided for tactical reasons not to appeal the trial court's dismissal of *Bait Aaron*. However, the time spent briefing the other issues, conducting research and discovery, and developing the theory of the case were all tasks that were inextricably intertwined with the present case and would have needed to be duplicated for the present case. Accordingly, these billable hours are compensable in the present case. (*City of San Diego, supra,* 237 Cal.App.4th at 104.)

If Plaintiff is successful in the present matter, it will seek attorneys' fees not only for billable hours incurred since the filing of the complaint, but also for pre-litigation hours that were reasonably spent in preparation for bringing this case. These hours easily exceed the jurisdictional threshold. The U.S. District Court for the Southern District of California found Plaintiff's attorneys Bryan Pease and David Simon to have reasonable San Diego hourly rates of $425 and $475 per hour, respectively, as of June 2016. (Pease Declaration in Opposition to Defendants' Motion to Dismiss and Anti-SLAPP Motion ("Pease Oppo. Decl."), Ex. D.) Hourly legal rates in Los Angeles are higher, and a Los Angeles Superior Court judge recently ruled, "Cardiff [another attorney] and Pease [Plaintiff's counsel] are experienced attorneys and perhaps could reasonably charge up to $600 for more complex civil rights or environmental protection cases in Los Angeles." (Pease Oppo. Decl., Ex. C.)

While Plaintiff's attorneys' fees have already met the jurisdictional threshold at the time of the filing of the complaint and ex parte application in the present matter, the Court may also consider hours likely to be incurred to bring this case to conclusion. "Where the law entitles the prevailing plaintiff to recover reasonable attorney fees, a reasonable estimate of fees likely to be incurred to resolution is part of the benefit permissibly sought by the plaintiff and thus contributes to the amount in controversy."

(*Brady v. Mercedes-Benz USA, Inc.*, 243 F. Supp. 2d 1004, 1011 (N.D. Cal. 2002).) "[T]he preponderance of courts in this Circuit have agreed with the Brady approach." (*Pulera v. F&B, Inc.*, 2008 U.S. Dist. LEXIS 72659, 14-15 (E.D. Cal. Aug. 18, 2008).)

*Brady* makes it clear that an estimate of the *total* fees likely to be incurred in the course of the litigation can be used in determining whether the amount in controversy requirement is satisfied at the outset. "The amount of fees commonly incurred in similar litigation can usually be reasonably estimated based on experience. Certainly, attorneys are often called upon by their clients before or at the outset of litigation to give an estimate of the fees likely to be incurred in prosecuting or defending a case to resolution." (*Brady*, 243 F. Supp. 2d at 1011.)

As noted, pre-litigation fees for Plaintiff have already exceeded $75,000, including billable hours inextricably intertwined   with a prior case. Independent of such pre-litigation fees, Plaintiff's fees to litigate this case from the date of filing this case to its conclusion will also easily exceed $75,000.

"The present case is very similar to *Bait Aaron* and involves the same plaintiff and subject matter. While *Bait Aaron* did not address the issue of whether Penal Code section 597(a) prohibits killing and discarding animals for a religious ritual (or for any other purpose), it did deal with the same issues regarding California's Unfair Competition Law ('UCL') and the question regarding constitutional protection for religious animal sacrifice." (Simon Decl., ¶ 4.) Accordingly, it can be readily determined that the present case will cause Plaintiff to incur over $75,000 in attorneys' fees for which Defendants will be liable. Plaintiff's counsel "estimate that the total billable hours…on the present case will ultimately meet or exceed the billable hours…expended in *Bait Aaron.*" (*Id.*)

Even if this Court finds that any one of these three items (cost to Defendants of complying with the injunction, pre-litigation attorneys' fees, or attorneys' fees for the entire action) is not reasonably likely meet the jurisdictional threshold on its own, any

two of them taken together easily exceed $75,000. As all three items should be added together to determine if the threshold is met, the Court has diversity jurisdiction.

### B.     Abstention is not warranted

Defendants argue this Court should abstain from hearing the present matter because there is a "nearly identical, pending state court case." (Motion at 9:22.) While untrue as discussed in the introduction, this contention is also irrelevant, as Plaintiff is not a party to the state court case and is entitled to have its own day in court and to have its matter heard in federal court – where, unlike the state court plaintiff, diversity of citizenship provides Plaintiff with standing. Further, while the state court case also involves the Chabad of Irvine and its Kapparot ritual, the Penal Code issues raised are different.

The state court complaint Defendants attach to their motion lists the statutes and ordinances the plaintiff in that case is relying on to support its claim, and Penal Code section 597(a) is not one of them. Instead, the state court case relies on Penal Code section 597(b), which deals with cruelty or unnecessary suffering rather than intentional and malicious killing. Whether killing and discarding animals for a religious ritual is illegal *per se* is a different issue from those raised in the state court case. Defendants do not seem to be arguing that they are entitled to cause unnecessary *pain and suffering* to an animal in the name of religion, and thus the question in the state court case is a factual one regarding whether this is occurring or not. However, in the present federal case, there is a purely legal question concerning whether Defendants can kill the animals *at all* if they are not being used for a permitted purpose, such as food.

The present case also does not address any of the environmental or public health laws raised in the state court case but instead deals directly with the core constitutional issue of whether a Penal Code exception is required for carrying out acts that would be illegal if done for a secular purpose, i.e. killing and disposing of chickens rather than using them for food. Thus, there is a direct conflict in the present case between what

Defendants assert is their constitutional right to kill animals in the name of religion, and Plaintiff's position that such conduct is illegal no matter how it is carried out – if the animal is being disposed of rather than being used for food.

The main case relied on by Defendants for abstention, *Colorado River Water Conservation Dist. v. United States* (1976) 424 U.S. 800 ("*Colorado River*"), actually supports the opposite result. In that case, which involved water rights that were already being litigated in state court, the Supreme Court found the "case falls within none of the abstention categories" and instead dismissed the case based on "principles unrelated to considerations of proper contemporaneous exercise of concurrent jurisdictions." (*Id.* at 1246.)  "Generally, as between state and federal courts, the rule is that 'the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction….' [Citations.]" (*Ibid.*)

The Supreme Court went on to note that while U.S. District Courts seek to avoid duplicative litigation among themselves, there is a "difference in general approach between state-federal concurrent jurisdiction and wholly federal concurrent jurisdiction," which "stems from the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them." (*Ibid.*)

As explained in *R.R. St. & Co. v. Transp. Ins. Co.,* 656 F.3d 966, 978 (9th Cir. 2011) ("*R.R. St. & Co.*"), the *Colorado River* factors raised by Defendants do not pertain to the doctrine of abstention, which is a separate doctrine having no application to that case or the present one, but rather to whether "exceptional circumstances…warrant a... stay or dismissal." (*R.R. St. & Co.* at 978.)

However, none of these exceptional circumstances apply to the present case:

*(1) Which court first assumed jurisdiction over any property at stake;*

There is no property at stake in the instant case.

*(2) The inconvenience of the federal forum;*

Defendants have not argued the federal forum is inconvenient for them.

*(3) The desire to avoid piecemeal litigation;*

"The mere possibility of piecemeal litigation does not constitute an exceptional circumstance. [Citation.] Instead, the case must raise a 'special concern about piecemeal litigation.' [Citation.]" (*Id.* at 979.)

Defendants have identified no such special concern in the present case.

*(4) The order in which the forums obtained jurisdiction;*

"The Supreme Court has instructed that instead of taking a mechanical approach, courts must apply this factor 'in a pragmatic, flexible manner with a view to the realities of the case at hand.' *Moses H. Cone*, 460 U.S. at 21 (giving little weight to the dates of filing when the same relative progress had been made in the state and federal proceedings)." (R.R. St. & Co., *supra,* 656 F.3d at 980.)

*(5) Whether federal law or state law provides the rule of decision on the merits;*

*R.R. St. & Co.* found "the 'presence of state-law issues may weigh in favor of that surrender only 'in some rare circumstances.'" (*Id.* at 980.) The only argument Defendants in the instant case present on this issue is that "whether religious ceremonies can be considered business acts under California's UCL, and whether the intent involved in a religious atonement ceremony is 'malicious' under California's Penal Code" are questions that the "state court is better positioned to resolve." (Motion at 11:16-21.) However, these are straightforward questions of statutory application and do not present the rare circumstances required by *R.R. St. & Co.* for a stay or dismissal.

*(6) Whether the state court proceedings can adequately protect the rights of the federal litigants;*

"A district court **may not** stay or dismiss the federal proceeding if the state proceeding cannot adequately protect the rights of the federal litigants." (*Id.* at 981, emphasis added.) As Plaintiff United Poultry Concerns is not a party to the state court litigation, nor has the state court litigation raised the question of killing and discarding of animals for religious purposes being illegal *per se* under Penal Code section 597(a), the

state court litigation absolutely cannot protected Plaintiff's rights. Accordingly, this Court may *not* stay or dismiss this action under *R.R. St. & Co.*

*(7) The desire to avoid forum shopping;*

"'[T]he desire for a federal forum is assured by the constitutional provision for diversity jurisdiction and the congressional statute implementing Article III.' *First State Ins. Co. v. Callan Assocs., Inc.*, 113 F.3d 161, 162 (9th Cir. 1997)." (*R.R. St. & Co., supra*, 656 F.3d at 982.) Plaintiff is entitled to have its own separate claim heard in federal court, which also involves a separate statutory provision, Penal Code section 597(a) rather than 597(b).

*(8) Whether the state court proceedings will resolve all issues before the federal court;*

The state court proceedings will not resolve the issue of whether Penal Code section 597(a) prohibits Defendants from killing and discarding animals for a religious ritual because that issue was not raised. Instead, the state court action is focused on whether Chabad of Irvine is causing unnecessary pain and suffering to an animal in violation of Penal Code section 597(b), which is a separate issue for which it should be even more clear there is not any constitutional defense. Defendants do not appear to assert their religion entitles them to cause unnecessary pain and suffering to animals, and whether they are doing so is a factual dispute in the state court action. The present federal action involving different parties raises the separate question of whether Defendants are entitled to kill animals at all for a religious ritual when there is no exception to Penal Code section 597(a) for their conduct. This factor also weights against a stay or dismissal.

Finally, the *Pullman* doctrine referred to by Defendants is inapplicable here where there are different parties in the state and federal proceedings, and the state court proceeding does not even involve the same law at issue in the state court proceeding, Penal Code section 597(a).

### C. Plaintiff has standing

Defendants improperly ask this Court to ignore the California Court of Appeal in *Napa Partners* because they believe the California Supreme Court would have taken a different approach. However, the California Supreme Court denied both a petition for review of that case and a request for depublication. (*Animal Legal Defense Fund v. LT Napa Partners* (June 10, 2015, No. S225790) ___Cal.5th___ [2015 Cal. LEXIS 4200].) As Defendants admit, "this Court is bound to follow the state's highest court on matters of state law." (Motion at 14-15.) The earlier case cited by Defendants, *Kwikset Corp. v. Superior Court* (2011) 246 P.3d 877, 881, did not involve diversion of organizational resources and the organizational standing test later ruled on in *Napa Partners*. Federal courts are bound to follow *Napa Partners* regarding organizational standing under the UCL. (*See, e.g., Animal Legal Defense Fund v. Great Bull Run* (June 6, 2014), Case No. 14-cv001171-MEJ, 2014 WL 2568685, 2014 U.S. Dist. LEXIS 78367.)

### 1. The challenged act is a business practice

Defendants have produced a Quickbooks spreadsheet purporting to show income and expenses for their use of chickens in Kapparot in 2014, although the entries are not explained, save for a payment to "cash" and another payment to a relative of Defendant Tenenbaum. This evidence alone shows that the challenged act is a business practice because it involves profit and loss. Not all business activity always results in a profit. By generating revenue and paying workers, including a relative of Defendant Tenenbaum, Defendants are engaging in business activity in their use of chickens for Kapparot.

Plaintiff has also produced evidence that use of chickens in Kapparot is a lucrative enterprise that is relied on by entities affiliated with Defendants as one of their biggest fundraising opportunities. (Pease MPI Decl., Dkt. #68-13, ¶¶ 4-7.)

Although Defendants may be non-profit organizations, or affiliated with non-profit organizations, they are nevertheless subject to the UCL. Courts have repeatedly held that non-profit organizations are "businesses" subject to the UCL – and that their practices are

"business practices" subject to the UCL. (*See, e.g., Executive Committee Representing Signing Petitioners of Archdiocese of Western U.S. v. Kaplan,* 2004 WL 6084228, at *6 (C.D.Cal. 2004) (citing *People v. Orange County Charitable Services* (1999) 73 Cal.App.4th 1054, 1075–76) ("*Kaplan*") ("The solicitation activities of charities come within the purview of § 17200.").) Moreover, the UCL has been applied on a number of occasions to religious organizations such as Defendants. (*See, e.g., Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar*, 179 F.3d 1244 (9th Cir. 1999) (involving Sufi religious organization); *Kaplan, supra,* 2004 WL 6084228 (involving Catholic Church); *Pines v. Tomson* (1984) 160 Cal.App.3d 370 (involving Christian religious organization).) Thus, under the UCL, Defendants' activities in charging people a fee to kill and discard chickens are "business practices."

### 2.  Defendants are violating Penal Code section 597(a)

If there is no exception to Penal Code section 597(a) to allow Defendant to kill and discard animals for a religious ritual—and Defendants have not identified any—then doing so is by definition intentional and malicious. Defendants intend to carry out the act, and they have no legal justification for doing so. Defendants argue the term malicious must mean something more than merely intentional, or the statute would be redundant. However, the malicious nature of the act is based on the fact that there is no legal justification for carrying it out. Intentionally carrying out an illegal act satisfies the *mens rea* requirement. (*See* Penal Code § 7(4), defining "malice" as "intent to do a wrongful act, established either by proof or presumption of law.")

Defendants refer to laws allowing Kosher slaughter as proof that the method of killing is acceptable. However, this is completely wrong and totally misses the point. Kosher *slaughter*, by definition, indicates the animal being killed will be used "for human consumption." (Cal. Food & Agriculture Code section 18945.) If Defendants were using the animals for food as dictated by the law and their own purported religious beliefs – as stated on their own website – then the killings would be legal. Of course, in that case,

Defendants would first have to comply with strict state and federal slaughterhouse requirements, which would prevent their performing the ceremony in a parking lot or similarly non-hygienic and unregulated environment. It is the act of discarding the animals, rather than using them for a purpose enumerated in the penal code as being a socially acceptable reason to kill an animal, that makes the act illegal.

### D.    There is no constitutional right to kill animals for religious purposes

In *Fraternal Order of Police v. City of Newark*, 170 F.3d 359 (3d Cir. 1999) ("*Fraternal Order of Police*")*,* a police department implemented a "no beards" policy. Applicants sought exceptions for both medical and religious reasons, which were considered simultaneously. The medical exception was allowed while the religious exception was denied. Justice Alito wrote the opinion for the D.C. Circuit applying strict scrutiny because of apparent discriminatory intent in allowing the medical exception while simultaneously denying the religious exception.

In requiring a religious exception analogous to the medical one, the D.C. Circuit found "the Department's decision to provide medical exemptions while refusing religious exemptions *is sufficiently suggestive of discriminatory intent* so as to trigger heightened scrutiny under *Smith* and *Lukumi*." (*Id.* at 365, emphasis added.) However, the state law at issue in the present case was passed well before any religious exception was requested or even contemplated. There is no evidence this law was passed with discriminatory intent, nor that religious rituals were even considered in passing this general law.

Additionally, the act in which persons sought to engage in *Fraternal Order of Police* (wearing a beard) was allowed to some and denied to others. By contrast, in the present case, *nobody* is allowed to kill chickens and discard them, whether for a secular or religious purpose. Because nobody is allowed to do, for a secular purpose, the act that Defendants seek a religious exception for, the correct standard of review is rational basis.

Even if the Court were to determine that intermediate or even strict scrutiny did apply here, the injunction sought by Plaintiff meets that standard as well. The state has a

14

compelling interest in preventing the socially unacceptable behavior of killing and discarding animals as some kind of punishment for a person's bad acts, whether this anti-social behavior is motivated by religion, mental illness, or merely a desire to do harm to another. The law against killing and discarding animals is narrowly tailored, in that Defendants can still carry out their ritual if the animal is used for food – which is actually what Defendants in the past claimed they did do with the animals and what their own professed religious beliefs actually dictate. Killing and discarding animals in this manner and not using them for food is not only anti-social and illegal, but there is also no religious support for these acts whatsoever.

Defendants claim "Chabad is entitled to exercise its religion in the manner it deems appropriate, and not in the manner others prefer." However, conspicuously absent from any of Rabbi Tenenbaum's declarations is any claim that he or anyone actually deem it appropriate to kill and discard animals as part of this ritual. Rather, the correct way to perform the ritual—not in Plaintiff's view, but in Defendants' own stated view—is that the animal must be used as food to feed the poor. (See Motion to Dissolve TRO, Dkt. # 23, at 10:15; 13:1.) To do otherwise defeats the entire purpose of the ritual, according to what participants believe. (Hicks MPI Decl, Dkt. # 68-8, ¶5.) Accordingly, the legally required result Plaintiff is seeking is consistent with Defendants' own religious beliefs and does not burden these beliefs whatsoever.

Defendant Tenenbaum even admits in one of his declarations that while this Court's TRO was in effect in 2016, "some members of Chabad of Irvine participated in a Kapparot ritual that took place at a licensed slaughterhouse in Midway City." (Affidavit of Rabbi Alter Tenenbaum in Opposition to Plaintiff's MPI, Dkt. # 69-3, ¶ 3.) Thus, Defendants openly admit they can comply with both their own religious beliefs and the law requiring that chickens be killed in a licensed slaughterhouse and be used for human consumption, which is the only result Plaintiff is seeking in this case.

The case relied on by the Court to dissolve the TRO, *Hernandez v. Comm'r* (1989) 490 U.S. 680, was not briefed by Plaintiff at that time because it was cited on page 20 of the 30 page brief Defendants submitted prior to the Court and the parties having a telephonic hearing on the matter just hours later. In *Hernandez*, the Court found that quid pro quo payments to the Church of Scientology were not charitable contributions, and denial of requested deductions did *not* violate either the Establishment Clause or the Free Exercise Clause of the First Amendment because the statute was secular in purpose and neither advanced nor inhibited religion. The Court held the public interest in maintaining a uniform tax system also outweighed the potential burden on petitioners.

The "not within the judicial ken" language quoted by Defendants in their motion to dissolve the TRO and again in their motion to dismiss is cherry picked from the overall context of that paragraph, which explained that the burden imposed by the law on the religious practices of petitioners was not substantial, and that "even a substantial burden would be justified by the 'broad public interest in maintaining a sound tax system,' free of 'myriad exceptions flowing from a wide variety of religious beliefs.'" (*Id.* at 699-700.)

The paragraph starts by explaining the basis for the Free Exercise inquiry, which "asks whether government has placed a substantial burden on the observation of a central religious belief or practice and, if so, whether a compelling governmental interest justifies the burden." (*Id.* at 699.) In noting it is "not within the judicial ken to question the centrality of particular beliefs or practices to faith," the Court went on to "have doubts whether the alleged burden imposed by the deduction disallowance on the Scientologists' practices is a substantial one." (*Ibid.*) And, the Court *did* inquire into whether petitioners had adequately alleged a violation of their professed beliefs, noting: "Neither the payment nor the receipt of taxes is forbidden by the Scientology faith generally, and Scientology does not proscribe the payment of taxes in connection with auditing or training sessions specifically." (*Ibid.*) The Court went on to find that any "burden imposed on auditing or training therefore derives solely from the fact that, as a result of

the deduction denial, adherents have less money available to gain access to such sessions." (*Ibid.*)

In the present case, Defendants do not allege they must dispose of the chickens rather than use them for food. In fact, their own stated view of their religion says the opposite, including Defendants' website which they cited in their motion to dissolve the TRO. The only reason Defendants dispose of chickens rather than give them to the poor to eat as their religion actually dictates is that it would be more expensive to use refrigeration and follow health code laws with the carcasses.

Injunctive relief requiring Defendants to follow the law if they are going to accept money in exchange for killing chickens would thus not substantially burden Defendants' religion. It may mean Defendants will have less money, as in *Hernandez*, and it may mean Defendants will be required to comply with health code laws and actually use the chickens for food as they have been telling their congregants they do, but it would not require Defendants to violate any professed religious belief.

E.     **Defendants' actions are not speech**

Defendants' prior restraint arguments are completely inapplicable because Defendants are not engaged in free speech, and in any event, Plaintiff is not trying to curtail speech. Rather, Plaintiff seeks to enjoin Defendants from engaging in a non-expressive, illegal act. Defendants repeatedly refer to the killing as "free speech." However, the first problem with this argument is that Defendants do not identify what message, if any, their killing of animals supposedly conveys. Instead, without pointing to any facts that support their position, they misrepresent the holding of *Southern Oregon Barter Fair v. Jackson County, Oregon* (9th Cir. 2004) 372 F.3d 1128, 1135 ("*Southern Oregon*") by implying the case stands for the proposition that all "religious ceremonies" are expressive. (Opposition at 23:12-15.) However, *Southern Oregon* stands for no such proposition. On the contrary, in that case the Ninth Circuit upheld an Oregon law requiring that organizations – including religious ones – obtain a permit in order to

conduct a fair. In reaching its conclusion, the Ninth Circuit held "in this case, it is not crystal clear whether the purposes of the Fair are expressive." (*Southern Oregon*, 372 F.3d at 1135.) Similarly, there is no indication here that Defendants' actions in killing and discarding chickens is *itself* expressive, and accordingly, their behavior is not protected as speech. (*See Castillo v. Pacheco* (2007) 150 Cal.App.4th 242, 250.)

Defendants also rely on *Kaahumanu v. Hawaii,* 682 F.3d 789, 799 (9th Cir. 2012). This case involved the First Amendment right to hold a wedding ceremony on a public beach. "Wedding ceremonies convey important messages about the couple, their beliefs, and their relationship to each other and to their community." (*Id*.) However, unlike Defendants in the present case, who wish to be able to privately and secretly kill and discard chickens, the plaintiff in *Kaahumanu* wanted to be able to engage in First Amendment protected speech in a public forum.

The second problem with Defendants' claim that their behavior constitutes speech is they do not identify who the intended audience is for such purported speech. In fact, Defendants typically seek to perform Kapparot in secret and hidden away from public view. (Mulato MPI Decl., ¶ 6; Bernstein MPI Decl., ¶ 2.) This secretive behavior belies their claimed desire to express a message of any kind. Thus, Defendants' actions show a desire not to express a message, but instead to suppress and conceal matters that might be considered a message. Again, this shows their conduct is not intended to be expressive and is thus not entitled to protection as speech.

Moreover, even in the unlikely event that killing and discarding chickens does somehow constitute speech, the state's compelling interest in preventing this socially unacceptable behavior would warrant prohibiting such behavior, just as it does for anyone else regardless of motivation. (*See* discussion at Section II(D), *supra*).

/ /

/ /

## IV.   CONCLUSION

Defendants are not entitled to a judge-made exception to a neutral law of general applicability that prohibits *anyone*, regardless of intent, from killing and discarding chickens in a parking lot. Because Defendants charge money to participants to kill and discard the chickens, they are engaged in business practices within the meaning of the UCL. Plaintiff is an organization that advocates for humane treatment of animals, and it has spent money and resources combatting Defendants' illegal actions that divert from its organizational mission. Accordingly, Plaintiff has stated a claim upon which relief can be granted.

Respectfully submitted,           **SIMON LAW GROUP**
                                  **LAW OFFICE OF BRYAN W. PEASE**

Dated: January 3, 2017        By:    /s/ Bryan W. Pease

                                     David R. Simon
                                     Bryan W. Pease
                                     Attorneys for Plaintiff
                                     United Poultry Concerns