ROBINS KAPLAN LLP
Charles Cannizzaro, SB No. 280895
2049 Century Park East, 34th Floor
Los Angeles, CA 90067
Telephone: 310 552 0130
Facsimile: 310 229 5800
E-mail: CCannizzaro@RobinsKaplan.com

Attorney for
DR. MARK GOLDFEDER

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED POULTRY CONCERNS, <br><br> Plaintiff, <br><br> v. <br><br> CHABAD OF IRVINE, et al. <br><br> Defendants. | Case No. 8:16-cv-01810-AB-GJS <br><br> **DR. MARK GOLDFEDER'S BRIEF AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS** |

## INTRODUCTION

While the law requires treating all religious traditions equally, minority faiths face hurdles when seeking reasonable accommodations. The more unique an individual's belief system, the more concern exists that courts may misunderstand it. As reaffirmed in *Holt v. Hobbs*,[1] the broad protections of religious liberty are meant to be construed in favor of any exercise of religion, regardless if it is rooted in a system of religious belief or not. The history of jurisprudence in the area of minority religious protections suggests their traditions are often the easiest to dismiss without protections. Plaintiff's statements questioning the validity of Kapparot are blatantly inaccurate. There are intra-faith differences in any religion, and it is inconsequential that not all Jewish people practice Kapparot the same way.

---

[1] 135 S. Ct. 853 (2015).

61279426.1

As stated in *Thomas v. Review Board of Indiana*,[2] the consistency or understanding of a religion should not forfeit its protection under the First Amendment.

The law takes into account sincerity, and how meaningful certain rituals are to religious followers. By forcing Chabad not to use chickens in Kapparot under a "neutral" law, the Court would be infringing on their right to practice religion. California Penal Code § 597 is under-inclusive because it provides for secular exemptions but not religious ones. The sincerity of the ritual is established through persuasive Jewish authority, and because the statute does not respect that tradition, this Court should protect Chabad's right to perform a ritual based on its faith.

## FACTUAL AND PROCEDURAL BACKGROUD

Defendant Chabad of Irvine holds Kapparot, an introspective religious atonement ceremony involving chickens. Prior to the ceremony in 2014, Ronnie Kudlow Steinau ("Steinau"), a volunteer for Plaintiff United Poultry Concerns ("Plaintiff" or "UPC") allegedly called Chabad personnel and allegedly asked how much it cost to participate. The representative allegedly told her it would be $27. In October 2014, Steinau watched the ceremony without paying or participating. Animal Protection Rescue League ("APRL") filed a state suit against Chabad on September 11, 2015, based on the call between Steinau and the Chabad volunteer. APRL claimed Chabad violated California's Unfair Competition Law, and an animal cruelty statute, California Penal Code § 597. On August 19, 2016, the state court granted Chabad's judgment on the pleadings because APRL's allegations were insufficient. UPC filed the present suit in federal court, even though the amount of Chabad's alleged revenue from Kapparot was only $7,500 a year.

## ARGUMENT

### I. Plaintiff's Understanding of Jewish Law is Unequivocally Wrong

Plaintiff in this case severely—even offensively—mischaracterizes and

---

[2] 450 U.S. 707 (1981).

61279426.1

- 2 -

misstates the history and practice of the custom of performing Kapparot, specifically the practice of using a chicken in performance of the ritual.[3] Relying on one hyperbolic statement by an interested party in one local newspaper interview,[4] Plaintiff builds its case on the assumption that the custom does not have a long history in the United States.[5] Setting aside the fact Plaintiff is incorrect in assuming that the age of a religious ritual performed by sincere believers matters *at all* in this Court's analysis,[6] and to the extent that in Plaintiff's own mind it does matter, the practice of specifically using a chicken to perform the ritual of Kapparot on the day before Yom Kippur is quite old, and wherever Jewish people have found themselves in the world—including the United States before the 1970s—they have performed this ritual religiously. *See* Exhibit A to Request for Judicial Notice for a photograph of people performing Kapparot, with a chicken, in New York in 1901.[7]

The earliest source describing why a chicken is the specific animal used for this ceremony comes from a responsa letter published by the Geonic Rabbi and Jewish law decisor Mar Rav Sheshna in the early 9th century.[8] The letter explains why the custom, already widespread and accepted at that time, was specifically to use a chicken. The first reason is based on practicality, i.e., because chickens are readily available and less expensive than other, larger animals. The second reason

---

[3] *See* Klein Decl. ¶¶ 3-4, Doc. No. 68.10.
[4] Michael Orbach, *Plucky activists ruffle feathers, but supporters aren't chickening out*, The Jewish Star (Sept. 15, 2010), http://thejewishstar.com/stories/Crying-fouloverkaporos, 2011.
[5] Plaintiff's Memo in Support of the Motion for Preliminary Injunction, p. 4, Doc. No. 68 ("Defendants claim using chickens in this manner has a lengthy history; however, it has been practiced in the United States for only a few decades.").
[6] *See Frazee v. Ill. Dep't of Emp't Sec.*, 489 U.S. 829 (1989); *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707 (1981).
[7] Library of Congress online catalog, https://www.loc.gov/item/2012647932/ (last visited Jan. 17, 2017). Dr. Goldfeder requests this Court take *judicial notice* of Ex. A to the Request for Judicial Notice. Under Fed. R. Evid. 201, this Court can take judicial notice of public records and government documents available from reliable sources on the Internet, such as websites run by governmental agencies. *Gerritsen v. Warner Bros. Entm't Inc.*, 112 F. Supp. 3d 1011, 1017 (C.D. Cal. 2015). Ex. A to the Request for Judicial Notice is a picture from the Library of Congress's website depicting Kapparot as a part of Jewish ceremonial and religious life in New York in 1901.
[8] *See* Teshuvot HaGeonim, Sha'arei Teshuva no. 299.

goes more to the reflective spiritual heart of the practice: the custom is to use a chicken because the Talmud sometimes refers to a chicken by its Aramaic name 'Gever,'[9] which can also mean 'man' in Hebrew. The use of one 'gever' (chicken) for the practice can lead the other 'gever' on to further, deeper introspection.

While there are literally hundreds of sources for the practice of using a chicken for Kapparot, and many other reasons given in those sources as to why the custom is to use a chicken in particular,[10] as anyone familiar with Jewish law knows—just as anyone with legal training would understand regarding our own American judicial system—only certain sources are considered persuasive and/or binding, and different communities follow the rulings of their own established, authoritative sources. The following sources are some of the most important for this religious practice as they relate specifically to the Chabad community in question, and the decisors that they consider to be authoritative under Jewish law.

In his commentary to the Talmud,[11] Rabbi Asher ben Yechiel,[12] one of the most influential medieval decisors of Jewish law, approvingly cites the earlier responsa of Rav Sheshna, with both of the reasons for using a chicken. The Mordechai[13] (Rabbi Mordechai ben Hillel, another great medieval decisors) also records the practice of using chickens.[14] The Baal Haturim, Rabbi Jacob Ben Asher, one of the most important halachic figures in Jewish history, codifies this practice in his Code of Jewish Law, the Arbah Turim, in the 13th century.[15]

---

[9] *See, e.g.*, BT Yoma 20b.
[10] Some later commentaries even adduce scriptural significance to the practice, noting that one should endeavor to use a white chicken, in fulfillment of the verse in Isaiah 1:18: "If your sins are [red] like scarlet, they will be made white as snow."
[11] Commentary of the Rosh to Yoma 8:23.
[12] Known by an acronym of his Hebrew name, the Rosh, one of the most important halachic decisors in the Middle Ages. *See Asher ben Jehiel*, Jewish Encyclopedia, http://www.jewishencyclopedia.com/articles/1930-asher-ben-jehiel (last visited Jan. 13, 2017).
[13] *See Mordechai ben Hillel*, Wikipedia, https://en.wikipedia.org/wiki/Mordechai_ben_Hillel (last visited Jan. 13, 2017).
[14] Commentary of the Mordechai to beginning of BT Tracate Yoma.
[15] Tur Orach Chaim, 605.

While it is certainly true that over the course of time many great Jewish law figures have not endorsed the custom, again all that matters to a particular community is what their own accepted, authoritative, decisors say. For example, perhaps the most significant opponent of the chicken usage was Rabbi Joseph Caro[16] who objected to the practice in his medieval masterpiece of Jewish law, the Shulchan Aruch.[17] However, as it relates to this community, Rabbi Caro was a Sephardic rabbi;[18] Chabad Lubavitch Hasidim are of Ashkenazic descent.[19] In the glosses to the Shulchan Aruch that were made specifically for the Ashkenazic community, of which Defendants are descendants, Rabbi Moshe Isserles[20] notes that using chickens is in fact the custom in all places, and that it "should not be deviated from, for this is a custom of the pious."[21] Also, as it pertains to this community, Rabbi Isaac Luria, known as the Arizal,[22] one of the most important figures in Jewish mysticism and law, whose rulings are followed by many sects of Chasidim including Chabad Lubavitch, scrupulously followed this practice.[23] Perhaps most importantly, and again incontrovertibly, the Shulchan Aruch Harav,[24]

---

[16] *See Joseph ben Ephraim Karo*, Wikipedia, https://en.wikipedia.org/wiki/Joseph_ben_Ephraim_Karo (last visited Jan. 13, 2017).
[17] Shulchan Aruch, Orach Chaim 605:1.
[18] Sephardic Jewry is primarily descended from communities developed in the Iberian peninsula.
[19] Descended primarily from communities in Central and Eastern Europe. Lubavitch Hasidim are in fact from the Belorussian village Lyubavichi, now in Russia.
[20] *See Moses Isserles*, Wikipedia, https://en.wikipedia.org/wiki/Moses_Isserles (last visited Jan. 13, 2017).
[21] Rabbi Moshe Isserles (Rema) ad locum.
[22] Nissan Mindel, *Rabbi Isaac Luria The Ari Hakodosh*, Chabad, http://www.chabad.org/library/article_cdo/aid/111878/jewish/Rabbi-Isaac-Luria-The-Ari-Hakodosh.htm (last visited Jan. 13, 2017).
[23] *See* Kaf HaChaim (605:5), who also notes that this custom was accepted among Sephardic communities. In regard to those communities, *see also* Ben Ish Chai (Parshas Vayelech, p. 2) in support of this practice.
[24] *Shulchan Aruch HaRav*, Chabad, http://www.chabad.org/search/keyword_cdo/kid/11177/jewish/Shulchan-Aruch-HaRav.htm (last visited Jan. 13, 2017).

61279426.1 - 5 -

DR. MARK GOLDFEDER'S BRIEF AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS

the Restatement of Jewish Law written by Rav Schenur Zalman Liadi,[25] the founder of Chabad Hasidism, and the First Lubavitch Rebbe, considered by most Hasidim but especially by Lubavitch Hasidim as *the* authoritative halachic text that governs their daily lives, records the taking of a chicken for Kapparot as the correct practice, for the reasons listed above.[26] His descendent, the Seventh and last Lubavitch Rebbe, considered by Chabad Hasidim to be the ultimate final authority in all of Jewish law, scrupulously followed this practice and taught his followers to do so.

## II. Plaintiff's Argument Epitomizes Why Questions of Sincerity or Religious Belief Should Not Be Decided by Courts

Defendants have made clear that the use of chickens for Kapparot is a sincere religious practice based on their religious tradition, and Plaintiff is wrong to question (and certainly to misstate) that tradition. As Justice Alito noted in *Ben-Levi v. Brown* less than a year ago, "[t]he argument that a plaintiff's own interpretation of his or her religion must yield to the government's interpretation is foreclosed by our precedents. This Court has consistently refused to 'question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.'"[27]

In *Thomas*,[28] Chief Justice Burger held that Indiana's denial of unemployment compensation benefits to a worker, who terminated his job because of his religious beliefs, violated his First Amendment right to free exercise of religion. The Court also concluded it was error for the lower court to dissect the worker's religious belief that he could not participate in the production of armaments.[29] For example, it was irrelevant that other Jehovah's Witnesses had no

---

[25] *Rabbi Scheur Zalman of Liadi*, Chabad, http://www.chabad.org/library/article_cdo/aid/77049/jewish/Rabbi-Schneur-Zalman-of-Liadi.htm (last visited Jan. 13, 2017).
[26] Shulchan Aruch HaRav, Orach Chaim, p. 605.
[27] 136 S. Ct. 930, 934 (2016) (*citing Emp't Div. v. Smith*, 494 U.S. 872, 887 (1990), *superseded by statute as stated in Holt v. Hobbs*, 135 S. Ct. 853 (2015)).
[28] 450 U.S. 707 (1981).
[29] *Id.*

61279426.1

- 6 -

objection to producing armaments. Intra-faith differences are not uncommon among followers of a particular creed.[30] The Court clarified the guarantee of free exercise is not limited to beliefs shared by all members of a religious sect, as Courts are not arbiters of scriptural interpretation.[31] The Court noted the determination of what is a "religious" belief or practice is often a difficult and delicate task, but the resolution of that question is not to turn upon a judicial perception of the particular belief or practice in question. The Court made it clear that religious beliefs need not be acceptable, logical, consistent, or comprehensible to others to merit First Amendment protection.[32] We urge the Court to conclude, as the Supreme Court did in *Thomas*, that it is not for the judiciary to interpret what to use in Kapparot.

Plaintiff also seems to assert that the religion does not require chickens, even if they are preferred, and that this should weigh in favor of banning the practice.[33] Again, even if the Plaintiff's assumptions were correct, Plaintiff fails to understand that centrality and compulsion are simply not elements in the sincere religious practice analysis.[34] Plaintiff falls into a similar quagmire in their attempt to distinguish *Church of Lukumi Babalu Aye v. City of Hialeah*.[35] The main difference they seem to cite is that Chabad of Irvine does not use the Kapparot ceremony to appease a deity like practitioners of Santeria did in that case.[36] This argument is completely absurd on its face because limiting religious practice to the appeasement

---

[30] *Id.* at 715.
[31] *Id.* at 715-16.
[32] *Id.* at 713-14 (*citing Sherbert v. Verner*, 374 U.S. 398 (1963); *Wisconsin v. Yoder*, 406 U.S. 205, 215-16 (1972)).
[33] *See* Plaintiff's Memo in Support of Motion for Preliminary Injunction, p. 5, Doc. No. 68, citing Klein Decl. ¶¶ 3-4, Doc. No. 68.10 ("However, notwithstanding Kapparot's enormous increase in profitability following the introduction of chickens to the practice, using chickens in these rituals is not required by any religious teaching.").
[34] See for instance the provisions of the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. §§ 2000cc, *et seq.*, where for the purposes of religious protections, Congress defined the "exercise of religion" in the Religious Freedom Restoration Act to mean "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."
[35] 508 U.S. 520 (1993).
[36] *See id.* (Plaintiff's Memo in Support of Motion for Preliminary Injunction, p. 5, Doc. No. 68).

of a deity means questioning every religious tradition that does not have a deity associated with it. Such a narrow definition of religious exercise exists nowhere in federal law, state law, military law, free exercise jurisprudence, or elsewhere. In actuality, *Lukumi* stands for the very relevant premise that courts cannot selectively apply secular laws to target conduct motivated by religious beliefs.[37]

Plaintiff's continuous and offensive mis-categorization of Chabad's religious practice as merely an "emotional moment"[38] is exactly the type of religious discrimination the First Amendment seeks to prevent. Repeatedly, the Supreme Court has held that judges do not have the authority to pass judgment, dissect the beliefs, or question the reasonableness of an entire religion; rather, judges have the authority to pass judgment on the sincerity of an individual's religious belief.[39] The Supreme Court has made clear that the government should not deem a group or a religious practice as non-religious simply because those beliefs are inconsistent, idiosyncratic, strange, solipsistic, fantastic, or peculiar.[40] Defendants are sincere, and the Plaintiff's explanation of the tenets of the time-honored practice of Kapparot—based purely on their own reading and mis-interpretation—is grossly flawed and should not be recognized by this Court.

### III. Even if the Law Is Neutral, It Can Still Be Burdensome

Although Plaintiff correctly states *Sherbert*'s holding that a law that burdens religious practice need not be justified by a compelling governmental interest if it is neutral and of general applicability, Plaintiff fails to mention that this is only the beginning of the inquiry.[41] The Court in *Sherbert* stated that disqualifying a worker from benefits because she refused to work on Saturdays for religious reasons forced her to choose between following the precepts of her religion and forfeiting

---

[37] *Id.* at 524.
[38] *See id.* (Plaintiff's Memo in Support of Motion for Preliminary Injunction, p. 2, Doc. No. 68).
[39] *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520 (1993); *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707 (1981).
[40] *Id.*
[41] *Sherbert v. Verner*, 374 U.S. 398, 403-04 (1963).

DR. MARK GOLDFEDER'S BRIEF AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS

benefits.[42] The Court in *Sherbert* stated that governmental imposition of such a choice puts a burden upon her free exercise of religion.[43] The Court in *Thomas* elaborated on this position; "[a] regulation neutral on its face may, in its application, nonetheless offend the constitutional requirement for governmental neutrality if it unduly burdens the free exercise of religion."[44] Chabad does not ask to be free from generally applicable laws, but does urge this Court to protect its right to equal treatment. Under *Lukumi*, the government cannot afford secular exemptions to a broad ban on certain conduct while at the same time denying religious exemptions from the ban.[45] Such laws, regardless of the motivation of the lawmakers, are not generally applicable, and thus, the application of those laws to religiously-motivated conduct is subject to strict scrutiny.[46]

## IV. The Law Is Under-Inclusive

There are a host of secular exceptions referenced in California Penal Code § 599(c), making the California Penal Code § 597(a) under-inclusive and not generally applicable.[47] As stated in *Lukumi*, when "individualized exemptions from a general requirement are available, the government may not refuse to extend that system to cases of religious hardship without compelling reason."[48] As explained by the Court in *Lukumi*, a law is under-inclusive if it fails to prohibit other "allegedly harmful conduct," consequently undermining any claim that denying a

---

[42] *Id.*
[43] *Id.*
[44] 450 U.S. 707, 716–17 (*citing Wisconsin v. Yoder*, 406 U.S. 205, 220 (1972)); *cf. Walz v. Tax Comm'n*, 397 U.S. 664 (1970).
[45] 508 U.S. 520.
[46] *Id.* at 537; *accord Stormans, Inc. v. Wiesman*, 794 F. 3d 1064, 1076 (9th Cir. 2015) ("For laws that are not neutral or not generally applicable, strict scrutiny applies."); Defendants' Motion to Dismiss, p. 29, Doc. No. 50.
[47] *Compare* Cal. Penal Code § 599c (listing exemptions for game laws, destroying certain birds, killing dangerous animals, and using animals for food, scientific experiments, or investigations), *with Lukumi*, 508 U.S. at 537 (listing exemptions for "hunting, slaughter of animals for food, eradication of insects and pests" but denying exemption for religious sacrifice).
[48] 508 U.S. at 537 (quotations and citations omitted); Defendant's Motion to Dismiss, pp. 29-30.

61279426.1

- 9 -

religious exemption is "genuinely" necessary to protect "an interest 'of the highest order.'"[49] The California statute is under-inclusive because it is contains many secular exemptions, without explicitly providing for religious exemptions. Despite Plaintiff's claims that Chabad is in violation of the statute, here, UPC cannot explain why it or the State can allow various secular exemptions and cannot exempt Chabad's Kapparot practice or any other religious practice. In addition, the State cannot explain any "compelling" need to deny any exemption for religious practices. These inconsistencies in California Penal Code § 597(a) and § 599(c) do not meet the standard for the careful tailoring strict scrutiny requires.

## CONCLUSION

The use of chickens for the Kapparot ritual is a time-honored and sincere religious ritual done for atonement and not for profit. Non-traditional religious practices, like Kapparot, deserve the same legal protections as mainstream religious traditions. Denying these protections would undermine the religious safeguards the First Amendment was intended to protect. For religious liberty, it is imperative this Court refuses to adopt the Plaintiff's flawed interpretation of Chabad's religious practice. This precedent could dangerously lead to discrimination towards non-traditional faiths with practices that are simply misunderstood. California Penal Code § 597(a) and § 599(c) are under-inclusive and not generally applicable, due to the omission of religious exemptions while allowing secular ones.

DATED: January 17, 2017

**ROBINS KAPLAN LLP**

By: *Charles Cannizzaro*
Charles Cannizzaro

**ATTORNEY FOR
DR. MARK GOLDFEDER**

---

[49] 508 U.S. at 578-79 (O'Connor, J., concurring).