ROBINS KAPLAN LLP
Charles Cannizzaro, SB #280895
2049 Century Park East, 34th Floor
Los Angeles, CA 90067
Telephone: 310 552 0130
Facsimile: 310 229 5800
E-mail: CCannizzaro@RobinsKaplan.com

Attorney for
DR. MARK GOLDFEDER

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED POULTRY CONCERNS,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>CHABAD OF IRVINE, et al.<br><br>　　　　Defendants. | Case No. 8:16-cv-01810-AB-GJS<br><br>**NOTICE OF MOTION AND MOTION FOR LEAVE TO FILE DR. MARK GOLDFEDER'S BRIEF AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS** |

　　COMES NOW Dr. Mark Goldfeder who hereby moves for leave to file an amicus brief in support of Defendants. This motion is based on the Memorandum in Support and attachments, the Complaint, the complete files in this action, and upon such oral and documentary evidence as may be allowed at a hearing on January 23, 2017 at 10:00 am. Dr. Goldfeder attempted to obtain the stipulation of the parties to file his brief. Defendants consented. Plaintiff has not responded.

DATED: January 17, 2017

　　　　　　　　　　　　　　　**ROBINS KAPLAN LLP**

　　　　　　　　　　　　　　　By: *Charles Cannizzaro*
　　　　　　　　　　　　　　　　　　Charles Cannizzaro

　　　　　　　　　　　　　　　**ATTORNEY FOR
　　　　　　　　　　　　　　　DR. MARK GOLDFEDER**

61279425.1

# MEMORANDUM IN SUPPORT

## Introduction

Professor Mark Goldfeder respectfully requests leave of this Court to file the accompanying *amicus curiae* brief, pursuant to the Court's inherent authority, in support of Defendants on Plaintiffs' Motion for Preliminary Injunction and Defendants' pending Motion to Dismiss. Dr. Goldfeder is a Senior Lecturer at Emory Law School specializing in advanced Law and Religion, and Jewish law. He has a unique perspective not only as a practitioner and scholar, but he has also been admitted to several rabbinic courts, including Chabad courts. Chabad emissaries serve at over 4,000 institutions in 84 countries, and there are Chabad centers in all 50 states. The issue in this litigation will affect the liberties of approximately 20,000 Chabad followers and their ability to practice their own religion in the United States as they sincerely understand it.

## Argument

### I. Defendants Did, and Plaintiff Did Not, Consent to the Brief

Even though Defendants have consented to the filing of the attached amicus brief, Plaintiff has been non-responsive to repeated contact. Dr. Goldfeder's counsel sent an e-mail to and left a voicemail for counsel to United Poultry Concerns, Mr. Bryan Pease, on January 13, 2017 to obtain his client's consent for Dr. Goldfeder to file the attached brief. (*See* Ex. A to Cannizzaro Decl.) As of the filing this Application, Mr. Pease has not responded to counsel. Dr. Goldfeder has thus attempted to resolve any dispute in good faith without court involvement. If the Court wishes to set a hearing, Mr. Goldfeder's counsel is ready and willing to make arguments on January 23, 2017 at 10:00 am at the scheduled hearings for Defendants' Motion to Dismiss and Plaintiff's Motion for Preliminary Injunction.

### II. Mr. Goldfeder's Brief Is Useful and Critical to the Court

Federal district courts have the inherent authority to permit a non-party to participate as *amicus curiae*, and they have broad discretion in the matter. *Hoptowit*

*v. Ray*, 682 F.2d 1237, 1260 (9th Cir. 1982). A decision to grant participation as *amicus curiae* is reviewed under an abuse-of-discretion standard. *Id.* Further, courts have generally exercised great liberality in permitting *amicus curiae* to file a brief in a pending case, and, with further permission of the court, to argue the case and introduce evidence.[1] *In re Roxford Foods Litig.*, 790 F. Supp. 987, 997 (E.D. Cal. 1991). There are no strict prerequisites that must be established prior to qualifying for amicus status; an individual seeking to appear as amicus must merely make a showing that his participation is useful to the court. *Id.*

### A. Dr. Goldfeder Specializes in Chabad as Scholar and Judge

Dr. Goldfeder's amicus brief is not only useful, but critical, to the Court's decision on Defendants' Motion to Dismiss and Plaintiff's Motion for Preliminary Injunction. (*See* Ex. 1 to Notice of Motion and Motion for Leave.) Defendants have filed a complaint, under California's Unfair Competition Law and an animal cruelty statute, California Penal Code § 597(a), against the Chabad of Irvine and its rabbi in an effort to enjoin them from participating in a historic Jewish ceremony known as Kapparot. (Doc. No. 1.) Dr. Goldfeder not only has particular familiarity with the Chabad community and the history and practice of Kapparot, but he specializes in advanced Jewish law as a rabbi and rabbinic judge. Dr. Goldfeder is a Senior Lecturer at Emory Law School, Senior Fellow at the Center for the Study of Law and Religion, Director of the Law and Religion Student Program, and Director of the Religious Freedom Project. He is also an adjunct professor of Religion at Emory University, and an adjunct Professor of Law at Georgia State University. He

---

[1] Dr. Goldfeder requests this Court take *judicial notice* of Ex. A to the Request for Judicial Notice. Under Fed. R. Evid. 201, this Court can take judicial notice of public records and government documents available from reliable sources on the Internet, such as websites run by governmental agencies. *Gerritsen v. Warner Bros. Entm't Inc.*, 112 F. Supp. 3d 1011, 1017 (C.D. Cal. 2015). Ex. A to the Request for Judicial Notice is a picture from the Library of Congress's website depicting Kapparot as a part of Jewish ceremonial and religious life in New York in 1901.

has written dozens of articles on law and religion topics. He holds four rabbinic ordinations, and has served as a rabbi and as a Jewish judge in different settings. For one ordination, he spent three years studying at a Chabad Lubavitch Institute of advanced Jewish law, and is intimately familiar with the Chabad and its customs.

### B. This Case Affects Chabad's Religious Liberty in United States

This case involves important issues regarding religious liberty under the First Amendment and affects over 20,000 Chabad followers throughout the United States in Chabad centers in all 50 states. The Chabad community observes a form of Jewish tradition recognized worldwide with Chabad emissaries serving at over 4,000 institutions in 84 countries. The Court's decision in this case will affect the Chabad community's ability to practice its own religion in the United States as it sincerely understands it. As a result, Dr. Mark Goldfeder's brief serves a useful purpose to the Court in helping it to understand the nature of Kapparot as an important religious atonement ceremony before rendering its decision.

### Conclusion

Dr. Goldfeder's amicus brief is attached to this Notice of Motion and Motion as Exhibit 1. It is critical for this Court to understand the history and practices of the Chabad community before adjudicating an issue affecting the rights of its followers. Thus, Dr. Mark Goldfeder respectfully requests that this Court grant him *amicus curiae* status to file the attached amicus brief in support of Defendants on Plaintiffs' Motion for Preliminary Injunction and Defendants' Motion to Dismiss.

DATED: January 17, 2017

ROBINS KAPLAN LLP

By: *Charles Cannizzaro*
Charles Cannizzaro

ATTORNEY FOR
DR. MARK GOLDFEDER

# EXHIBIT 1

ROBINS KAPLAN LLP
Charles Cannizzaro, SB No. 280895
2049 Century Park East, 34th Floor
Los Angeles, CA 90067
Telephone: 310 552 0130
Facsimile: 310 229 5800
E-mail: CCannizzaro@RobinsKaplan.com

Attorney for
DR. MARK GOLDFEDER

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| UNITED POULTRY CONCERNS, | Case No. 8:16-cv-01810-AB-GJS |
|---|---|
| Plaintiff, | **DR. MARK GOLDFEDER'S BRIEF AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS** |
| v. | |
| CHABAD OF IRVINE, et al. | |
| Defendants. | |

## INTRODUCTION

While the law requires treating all religious traditions equally, minority faiths face hurdles when seeking reasonable accommodations. The more unique an individual's belief system, the more concern exists that courts may misunderstand it. As reaffirmed in *Holt v. Hobbs*,[1] the broad protections of religious liberty are meant to be construed in favor of any exercise of religion, regardless if it is rooted in a system of religious belief or not. The history of jurisprudence in the area of minority religious protections suggests their traditions are often the easiest to dismiss without protections. Plaintiff's statements questioning the validity of Kapparot are blatantly inaccurate. There are intra-faith differences in any religion, and it is inconsequential that not all Jewish people practice Kapparot the same way.

---
[1] 135 S. Ct. 853 (2015).

61279426.1

DR. MARK GOLDFEDER'S BRIEF AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS

As stated in *Thomas v. Review Board of Indiana*,[2] the consistency or understanding of a religion should not forfeit its protection under the First Amendment.

The law takes into account sincerity, and how meaningful certain rituals are to religious followers. By forcing Chabad not to use chickens in Kapparot under a "neutral" law, the Court would be infringing on their right to practice religion. California Penal Code § 597 is under-inclusive because it provides for secular exemptions but not religious ones. The sincerity of the ritual is established through persuasive Jewish authority, and because the statute does not respect that tradition, this Court should protect Chabad's right to perform a ritual based on its faith.

## FACTUAL AND PROCEDURAL BACKGROUD

Defendant Chabad of Irvine holds Kapparot, an introspective religious atonement ceremony involving chickens. Prior to the ceremony in 2014, Ronnie Kudlow Steinau ("Steinau"), a volunteer for Plaintiff United Poultry Concerns ("Plaintiff" or "UPC") allegedly called Chabad personnel and allegedly asked how much it cost to participate. The representative allegedly told her it would be $27. In October 2014, Steinau watched the ceremony without paying or participating. Animal Protection Rescue League ("APRL") filed a state suit against Chabad on September 11, 2015, based on the call between Steinau and the Chabad volunteer. APRL claimed Chabad violated California's Unfair Competition Law, and an animal cruelty statute, California Penal Code § 597. On August 19, 2016, the state court granted Chabad's judgment on the pleadings because APRL's allegations were insufficient. UPC filed the present suit in federal court, even though the amount of Chabad's alleged revenue from Kapparot was only $7,500 a year.

## ARGUMENT

### I. Plaintiff's Understanding of Jewish Law is Unequivocally Wrong

Plaintiff in this case severely—even offensively—mischaracterizes and

---

[2] 450 U.S. 707 (1981).

61279426.1

- 2 -

misstates the history and practice of the custom of performing Kapparot, specifically the practice of using a chicken in performance of the ritual.[3] Relying on one hyperbolic statement by an interested party in one local newspaper interview,[4] Plaintiff builds its case on the assumption that the custom does not have a long history in the United States.[5] Setting aside the fact Plaintiff is incorrect in assuming that the age of a religious ritual performed by sincere believers matters *at all* in this Court's analysis,[6] and to the extent that in Plaintiff's own mind it does matter, the practice of specifically using a chicken to perform the ritual of Kapparot on the day before Yom Kippur is quite old, and wherever Jewish people have found themselves in the world—including the United States before the 1970s—they have performed this ritual religiously. *See* Exhibit A to Request for Judicial Notice for a photograph of people performing Kapparot, with a chicken, in New York in 1901.[7]

The earliest source describing why a chicken is the specific animal used for this ceremony comes from a responsa letter published by the Geonic Rabbi and Jewish law decisor Mar Rav Sheshna in the early 9th century.[8] The letter explains why the custom, already widespread and accepted at that time, was specifically to use a chicken. The first reason is based on practicality, i.e., because chickens are readily available and less expensive than other, larger animals. The second reason

---

[3] *See* Klein Decl. ¶¶ 3-4, Doc. No. 68.10.
[4] Michael Orbach, *Plucky activists ruffle feathers, but supporters aren't chickening out*, The Jewish Star (Sept. 15, 2010), http://thejewishstar.com/stories/Crying-fouloverkaporos, 2011.
[5] Plaintiff's Memo in Support of the Motion for Preliminary Injunction, p. 4, Doc. No. 68 ("Defendants claim using chickens in this manner has a lengthy history; however, it has been practiced in the United States for only a few decades.").
[6] *See Frazee v. Ill. Dep't of Emp't Sec.*, 489 U.S. 829 (1989); *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707 (1981).
[7] Library of Congress online catalog, https://www.loc.gov/item/2012647932/ (last visited Jan. 17, 2017). Dr. Goldfeder requests this Court take *judicial notice* of Ex. A to the Request for Judicial Notice. Under Fed. R. Evid. 201, this Court can take judicial notice of public records and government documents available from reliable sources on the Internet, such as websites run by governmental agencies. *Gerritsen v. Warner Bros. Entm't Inc.*, 112 F. Supp. 3d 1011, 1017 (C.D. Cal. 2015). Ex. A to the Request for Judicial Notice is a picture from the Library of Congress's website depicting Kapparot as a part of Jewish ceremonial and religious life in New York in 1901.
[8] *See* Teshuvot HaGeonim, Sha'arei Teshuva no. 299.

goes more to the reflective spiritual heart of the practice: the custom is to use a chicken because the Talmud sometimes refers to a chicken by its Aramaic name 'Gever,'[9] which can also mean 'man' in Hebrew. The use of one 'gever' (chicken) for the practice can lead the other 'gever' on to further, deeper introspection.

While there are literally hundreds of sources for the practice of using a chicken for Kapparot, and many other reasons given in those sources as to why the custom is to use a chicken in particular,[10] as anyone familiar with Jewish law knows—just as anyone with legal training would understand regarding our own American judicial system—only certain sources are considered persuasive and/or binding, and different communities follow the rulings of their own established, authoritative sources. The following sources are some of the most important for this religious practice as they relate specifically to the Chabad community in question, and the decisors that they consider to be authoritative under Jewish law.

In his commentary to the Talmud,[11] Rabbi Asher ben Yechiel,[12] one of the most influential medieval decisors of Jewish law, approvingly cites the earlier responsa of Rav Sheshna, with both of the reasons for using a chicken. The Mordechai[13] (Rabbi Mordechai ben Hillel, another great medieval decisors) also records the practice of using chickens.[14] The Baal Haturim, Rabbi Jacob Ben Asher, one of the most important halachic figures in Jewish history, codifies this practice in his Code of Jewish Law, the Arbah Turim, in the 13th century.[15]

---

[9] *See, e.g.*, BT Yoma 20b.
[10] Some later commentaries even adduce scriptural significance to the practice, noting that one should endeavor to use a white chicken, in fulfillment of the verse in Isaiah 1:18: "If your sins are [red] like scarlet, they will be made white as snow."
[11] Commentary of the Rosh to Yoma 8:23.
[12] Known by an acronym of his Hebrew name, the Rosh, one of the most important halachic decisors in the Middle Ages. *See Asher ben Jehiel*, Jewish Encyclopedia, http://www.jewishencyclopedia.com/articles/1930-asher-ben-jehiel (last visited Jan. 13, 2017).
[13] *See Mordechai ben Hillel*, Wikipedia, https://en.wikipedia.org/wiki/Mordechai_ben_Hillel (last visited Jan. 13, 2017).
[14] Commentary of the Mordechai to beginning of BT Tracate Yoma.
[15] Tur Orach Chaim, 605.

61279426.1
- 4 -

While it is certainly true that over the course of time many great Jewish law figures have not endorsed the custom, again all that matters to a particular community is what their own accepted, authoritative, decisors say. For example, perhaps the most significant opponent of the chicken usage was Rabbi Joseph Caro[16] who objected to the practice in his medieval masterpiece of Jewish law, the Shulchan Aruch.[17] However, as it relates to this community, Rabbi Caro was a Sephardic rabbi;[18] Chabad Lubavitch Hasidim are of Ashkenazic descent.[19] In the glosses to the Shulchan Aruch that were made specifically for the Ashkenazic community, of which Defendants are descendants, Rabbi Moshe Isserles[20] notes that using chickens is in fact the custom in all places, and that it "should not be deviated from, for this is a custom of the pious."[21] Also, as it pertains to this community, Rabbi Isaac Luria, known as the Arizal,[22] one of the most important figures in Jewish mysticism and law, whose rulings are followed by many sects of Chasidim including Chabad Lubavitch, scrupulously followed this practice.[23] Perhaps most importantly, and again incontrovertibly, the Shulchan Aruch Harav,[24]

---

[16] See *Joseph ben Ephraim Karo*, Wikipedia, https://en.wikipedia.org/wiki/Joseph_ben_Ephraim_Karo (last visited Jan. 13, 2017).
[17] Shulchan Aruch, Orach Chaim 605:1.
[18] Sephardic Jewry is primarily descended from communities developed in the Iberian peninsula.
[19] Descended primarily from communities in Central and Eastern Europe. Lubavitch Hasidim are in fact from the Belorussian village Lyubavichi, now in Russia.
[20] See *Moses Isserles*, Wikipedia, https://en.wikipedia.org/wiki/Moses_Isserles (last visited Jan. 13, 2017).
[21] Rabbi Moshe Isserles (Rema) ad locum.
[22] Nissan Mindel, *Rabbi Isaac Luria The Ari Hakodosh*, Chabad, http://www.chabad.org/library/article_cdo/aid/111878/jewish/Rabbi-Isaac-Luria-The-Ari-Hakodosh.htm (last visited Jan. 13, 2017).
[23] See Kaf HaChaim (605:5), who also notes that this custom was accepted among Sephardic communities. In regard to those communities, *see also* Ben Ish Chai (Parshas Vayelech, p. 2) in support of this practice.
[24] *Shulchan Aruch HaRav*, Chabad, http://www.chabad.org/search/keyword_cdo/kid/11177/jewish/Shulchan-Aruch-HaRav.htm (last visited Jan. 13, 2017).

61279426.1

- 5 -

the Restatement of Jewish Law written by Rav Schenur Zalman Liadi,[25] the founder of Chabad Hasidism, and the First Lubavitch Rebbe, considered by most Hasidim but especially by Lubavitch Hasidim as *the* authoritative halachic text that governs their daily lives, records the taking of a chicken for Kapparot as the correct practice, for the reasons listed above.[26] His descendent, the Seventh and last Lubavitch Rebbe, considered by Chabad Hasidim to be the ultimate final authority in all of Jewish law, scrupulously followed this practice and taught his followers to do so.

### II. Plaintiff's Argument Epitomizes Why Questions of Sincerity or Religious Belief Should Not Be Decided by Courts

Defendants have made clear that the use of chickens for Kapparot is a sincere religious practice based on their religious tradition, and Plaintiff is wrong to question (and certainly to misstate) that tradition. As Justice Alito noted in *Ben-Levi v. Brown* less than a year ago, "[t]he argument that a plaintiff's own interpretation of his or her religion must yield to the government's interpretation is foreclosed by our precedents. This Court has consistently refused to 'question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.'"[27]

In *Thomas*,[28] Chief Justice Burger held that Indiana's denial of unemployment compensation benefits to a worker, who terminated his job because of his religious beliefs, violated his First Amendment right to free exercise of religion. The Court also concluded it was error for the lower court to dissect the worker's religious belief that he could not participate in the production of armaments.[29] For example, it was irrelevant that other Jehovah's Witnesses had no

---

[25] *Rabbi Scheur Zalman of Liadi*, Chabad, http://www.chabad.org/library/article_cdo/aid/77049/jewish/Rabbi-Schneur-Zalman-of-Liadi.htm (last visited Jan. 13, 2017).
[26] Shulchan Aruch HaRav, Orach Chaim, p. 605.
[27] 136 S. Ct. 930, 934 (2016) (citing *Emp't Div. v. Smith*, 494 U.S. 872, 887 (1990), *superseded by statute as stated in Holt v. Hobbs*, 135 S. Ct. 853 (2015)).
[28] 450 U.S. 707 (1981).
[29] *Id.*

objection to producing armaments. Intra-faith differences are not uncommon among followers of a particular creed.[30] The Court clarified the guarantee of free exercise is not limited to beliefs shared by all members of a religious sect, as Courts are not arbiters of scriptural interpretation.[31] The Court noted the determination of what is a "religious" belief or practice is often a difficult and delicate task, but the resolution of that question is not to turn upon a judicial perception of the particular belief or practice in question. The Court made it clear that religious beliefs need not be acceptable, logical, consistent, or comprehensible to others to merit First Amendment protection.[32] We urge the Court to conclude, as the Supreme Court did in *Thomas*, that it is not for the judiciary to interpret what to use in Kapparot.

Plaintiff also seems to assert that the religion does not require chickens, even if they are preferred, and that this should weigh in favor of banning the practice.[33] Again, even if the Plaintiff's assumptions were correct, Plaintiff fails to understand that centrality and compulsion are simply not elements in the sincere religious practice analysis.[34] Plaintiff falls into a similar quagmire in their attempt to distinguish *Church of Lukumi Babalu Aye v. City of Hialeah*.[35] The main difference they seem to cite is that Chabad of Irvine does not use the Kapparot ceremony to appease a deity like practitioners of Santeria did in that case.[36] This argument is completely absurd on its face because limiting religious practice to the appeasement

---

[30] *Id.* at 715.
[31] *Id.* at 715-16.
[32] *Id.* at 713-14 (citing *Sherbert v. Verner*, 374 U.S. 398 (1963); *Wisconsin v. Yoder*, 406 U.S. 205, 215-16 (1972)).
[33] See Plaintiff's Memo in Support of Motion for Preliminary Injunction, p. 5, Doc. No. 68, citing Klein Decl. ¶¶ 3-4, Doc. No. 68.10 ("However, notwithstanding Kapparot's enormous increase in profitability following the introduction of chickens to the practice, using chickens in these rituals is not required by any religious teaching.").
[34] See for instance the provisions of the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. §§ 2000cc, *et seq.*, where for the purposes of religious protections, Congress defined the "exercise of religion" in the Religious Freedom Restoration Act to mean "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."
[35] 508 U.S. 520 (1993).
[36] *See id.* (Plaintiff's Memo in Support of Motion for Preliminary Injunction, p. 5, Doc. No. 68).

of a deity means questioning every religious tradition that does not have a deity associated with it. Such a narrow definition of religious exercise exists nowhere in federal law, state law, military law, free exercise jurisprudence, or elsewhere. In actuality, *Lukumi* stands for the very relevant premise that courts cannot selectively apply secular laws to target conduct motivated by religious beliefs.[37]

Plaintiff's continuous and offensive mis-categorization of Chabad's religious practice as merely an "emotional moment"[38] is exactly the type of religious discrimination the First Amendment seeks to prevent. Repeatedly, the Supreme Court has held that judges do not have the authority to pass judgment, dissect the beliefs, or question the reasonableness of an entire religion; rather, judges have the authority to pass judgment on the sincerity of an individual's religious belief.[39] The Supreme Court has made clear that the government should not deem a group or a religious practice as non-religious simply because those beliefs are inconsistent, idiosyncratic, strange, solipsistic, fantastic, or peculiar.[40] Defendants are sincere, and the Plaintiff's explanation of the tenets of the time-honored practice of Kapparot—based purely on their own reading and mis-interpretation—is grossly flawed and should not be recognized by this Court.

### III. Even if the Law Is Neutral, It Can Still Be Burdensome

Although Plaintiff correctly states *Sherbert*'s holding that a law that burdens religious practice need not be justified by a compelling governmental interest if it is neutral and of general applicability, Plaintiff fails to mention that this is only the beginning of the inquiry.[41] The Court in *Sherbert* stated that disqualifying a worker from benefits because she refused to work on Saturdays for religious reasons forced her to choose between following the precepts of her religion and forfeiting

---

[37] *Id.* at 524.
[38] *See id.* (Plaintiff's Memo in Support of Motion for Preliminary Injunction, p. 2, Doc. No. 68).
[39] *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520 (1993); *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707 (1981).
[40] *Id.*
[41] *Sherbert v. Verner*, 374 U.S. 398, 403-04 (1963).

61279426.1
- 8 -

DR. MARK GOLDFEDER'S BRIEF AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS

benefits.[42] The Court in *Sherbert* stated that governmental imposition of such a choice puts a burden upon her free exercise of religion.[43] The Court in *Thomas* elaborated on this position; "[a] regulation neutral on its face may, in its application, nonetheless offend the constitutional requirement for governmental neutrality if it unduly burdens the free exercise of religion."[44] Chabad does not ask to be free from generally applicable laws, but does urge this Court to protect its right to equal treatment. Under *Lukumi*, the government cannot afford secular exemptions to a broad ban on certain conduct while at the same time denying religious exemptions from the ban.[45] Such laws, regardless of the motivation of the lawmakers, are not generally applicable, and thus, the application of those laws to religiously-motivated conduct is subject to strict scrutiny.[46]

### IV. The Law Is Under-Inclusive

There are a host of secular exceptions referenced in California Penal Code § 599(c), making the California Penal Code § 597(a) under-inclusive and not generally applicable.[47] As stated in *Lukumi*, when "individualized exemptions from a general requirement are available, the government may not refuse to extend that system to cases of religious hardship without compelling reason."[48] As explained by the Court in *Lukumi*, a law is under-inclusive if it fails to prohibit other "allegedly harmful conduct," consequently undermining any claim that denying a

---

[42] *Id.*
[43] *Id.*
[44] 450 U.S. 707, 716–17 (*citing Wisconsin v. Yoder*, 406 U.S. 205, 220 (1972)); *cf. Walz v. Tax Comm'n*, 397 U.S. 664 (1970).
[45] 508 U.S. 520.
[46] *Id.* at 537; *accord Stormans, Inc. v. Wiesman*, 794 F. 3d 1064, 1076 (9th Cir. 2015) ("For laws that are not neutral or not generally applicable, strict scrutiny applies."); Defendants' Motion to Dismiss, p. 29, Doc. No. 50.
[47] *Compare* Cal. Penal Code § 599c (listing exemptions for game laws, destroying certain birds, killing dangerous animals, and using animals for food, scientific experiments, or investigations), *with Lukumi*, 508 U.S. at 537 (listing exemptions for "hunting, slaughter of animals for food, eradication of insects and pests" but denying exemption for religious sacrifice).
[48] 508 U.S. at 537 (quotations and citations omitted); Defendant's Motion to Dismiss, pp. 29-30.

61279426.1
- 9 -

DR. MARK GOLDFEDER'S BRIEF AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS

religious exemption is "genuinely" necessary to protect "an interest 'of the highest order.'"[49] The California statute is under-inclusive because it is contains many secular exemptions, without explicitly providing for religious exemptions. Despite Plaintiff's claims that Chabad is in violation of the statute, here, UPC cannot explain why it or the State can allow various secular exemptions and cannot exempt Chabad's Kapparot practice or any other religious practice. In addition, the State cannot explain any "compelling" need to deny any exemption for religious practices. These inconsistencies in California Penal Code § 597(a) and § 599(c) do not meet the standard for the careful tailoring strict scrutiny requires.

## CONCLUSION

The use of chickens for the Kapparot ritual is a time-honored and sincere religious ritual done for atonement and not for profit. Non-traditional religious practices, like Kapparot, deserve the same legal protections as mainstream religious traditions. Denying these protections would undermine the religious safeguards the First Amendment was intended to protect. For religious liberty, it is imperative this Court refuses to adopt the Plaintiff's flawed interpretation of Chabad's religious practice. This precedent could dangerously lead to discrimination towards non-traditional faiths with practices that are simply misunderstood. California Penal Code § 597(a) and § 599(c) are under-inclusive and not generally applicable, due to the omission of religious exemptions while allowing secular ones.

DATED: January 17, 2017

**ROBINS KAPLAN LLP**

By: *Charles Cannizzaro*
Charles Cannizzaro

**ATTORNEY FOR
DR. MARK GOLDFEDER**

---

[49] 508 U.S. at 578-79 (O'Connor, J., concurring).

61279426.1

- 10 -

DR. MARK GOLDFEDER'S BRIEF AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS